Hughes, J., not participating
OPINION
ANN CRAWFORD McCLURE, Chief Justice
Tanyee Johnson filed a medical malpractice suit against Dr. Scott Harris and Dr. Peter Rafael (and his associated professional association) over complications from a breast reduction surgery.[1] The case proceeded through discovery and was near its trial date when the defendant doctors challenged the qualifications of Dr. Herbert D. Stern, who was the only liability expert Johnson designated to testify at trial. The trial court granted both doctors' objections to Dr. Stern's testimony, and dismissed the case as to both defendant doctors.
We face several issues on appeal, but the critical question is whether the trial court abused its discretion in striking a medical expert's opinions because the expert had not performed the particular medical procedure at issue within four years of the alleged act of malpractice. Stated otherwise, we must determine whether Johnson has carried her burden to show her expert was qualified when his *296 knowledge of the relevant medical standard of care was claimed to be stale. For the reasons noted below, we affirm.
FACTUAL AND PROCEDURAL SUMMARY
The underlying suit alleges that Tanyee Johnson went to Dr. Harris for a bilateral breast reduction. Johnson is 5'6? feet tall and had a forty-eight inch quadruple D bra size. She sought the breast reduction to ease her neck, shoulder, and back pain. Breast augmentation procedures are relatively common, but breast reductions are somewhat less so. This particular breast reduction was rarer still. Because so much breast tissue needed be removed, the appropriate procedure involved a "free nipple graft", which means the nipple and areola are completely cut away, and once breast tissue is removed, the nipple and areola are then grafted back onto the remaining breast. One challenge with this technique is to re-establish adequate blood flow to the nipple complex.
Dr. Harris counseled Johnson on having the procedure, and he was the doctor who performed it. He also saw Johnson six days post-surgery (the April 5th visit). Because Dr. Harris was out of town for several days thereafter, Dr. Rafael saw Johnson on the ninth day post-procedure (the April 8th visit). Dr. Harris then returned and saw Johnson on the thirteenth day post procedure (the April 11th visit). During these post-procedure visits, the medical records document evolving post-procedure complications.
Johnson contends the breast tissue around the nipple complex during this time became necrotic, and that an infection developed in the dead or dying tissue. Dr. Harris had ordered additional oral antibiotics on the April 5th visit. Dr. Rafael on the April 8th visit changed the oral antibiotic, administered an injection of another broad-spectrum antibiotic, and ordered blood work. When Dr. Harris saw Johnson on the April 11th visit, he had her admitted to the hospital. During this extended hospital stay, she underwent several surgical procedures to remove necrotic tissue, and Johnson was effectively left with a bilateral mastectomy.
After filing suit, Johnson timely filed a qualifying exert report as required by Section 74.351(a) of the Texas Medical Liability Act ("TMLA"). TEX.CIV.PRAC. & REM.CODE ANN. § 74.351(a) (West 2017). The report was authored by Dr. Herbert D. Stern. Dr. Stern is licensed to practice medicine in Florida and is board certified by the American Board of Plastic Surgery, having held that certification since 1980. He was previously board certified in surgery, but allowed that certification to lapse. He maintains an active practice in plastic surgery with the majority of his cases involving re-contouring of the torso, and half of those involving breast procedures. Neither Dr. Harris nor Dr. Rafael challenged the qualifying medical report at the outset of the litigation.
The case was set for trial on March 2, 2015. A pretrial order set deadlines for expert designations and Johnson designated only Dr. Stern to establish liability and causation. The designation included an amended report from Dr. Stern that criticized Dr. Harris in four areas:
1. Johnson's pre-procedure blood work showed her to be anemic. Medical literature reports a correlation between anemic patients and postoperative infections. Dr. Stern believes the elective procedures should have been postponed until the anemia was addressed.
2. Based on comments in the operative report, Dr. Stern believes that Dr. Harris was not adequately familiar with the free nipple graftbreast reduction technique and should have either sought the *297 assistance of a surgeon more familiar with the procedure or elected not to carry out the procedure in the first place.
3. Dr. Harris delayed in properly diagnosing and treating Johnson's postoperative breast infections and tissue necrosis.
4. Based on Johnson's claim that she was not informed that the free nipple graft technique would forever prevent her from breastfeeding, Dr. Stern faults Dr. Harris for not disclosing this known and certain side-effect of the free nipple graft procedure.
In a later deposition, Dr. Stern added a fifth criticism:
5. Dr. Harris took too much breast tissue in the procedure (attempting to get to a B cup size from a DDDD) such that the skin flap was too thin and therefore more susceptible to necrosis and later infection.
The report also criticized Dr. Rafael, but only for his post-procedure follow up. Dr. Stern primarily faulted Dr. Raphael for not obtaining a proper fluid culture on the April 8th visit, and failing to hospitalize Johnson at that time. The report contained a paragraph generically contending that these failures were a proximate cause of Johnson's injuries.
Following Dr. Stern's deposition in early December 2014, both defendant doctors challenged his qualifications. Dr. Rafael did so in a motion to strike that was joined with a motion for summary judgment. Dr. Harris simply filed an objection and motion to dismiss.[2] Both motions were set for hearing on February 5, 2015, which would have been twenty-five days prior to the trial setting. After the hearing, at which no evidence was offered, the trial court struck Dr. Stern's opinions and granted Dr. Rafael's motion for summary judgment, and Dr. Harris' motion to dismiss. Johnson filed a motion for rehearing which complained only that Dr. Rafael's motion for summary judgment was not properly served.[3] The trial court overruled the motion for rehearing.
Johnson raises three challenges to the trial court's decision below. First, she contends that the trial court erred in granting a motion to dismiss, as there is no statutory or rule-based authority for granting a motion to dismiss (as distinct from, say, a motion for summary judgment as Dr. Rafael filed). In her second and third issues, she challenges the trial court's decision to strike her expert under the expert qualification standard in the MLIA and TEX.R.EVID. 702.
WAS DISMISSAL A PROPER PROCEDURAL OPTION?
Johnson's first issue raises only a procedural question: can a trial court simply dismiss a plaintiff's suit when it has stricken a necessary expert on the eve of trial but no procedural rule or statute expressly authorizes such a dismissal? We think the general answer to that question is no, but because Johnson did not complain *298 about the procedural vehicle used below, the objection is waived.
The MLIA has a specific provision allowing for the dismissal of a claim when an expert is struck at the outset of the litigation. A medical malpractice plaintiff must file a qualifying medical report within 120 days of the health care provider's answer. TEX.CIV.PRAC. & REM.CODE ANN. § 74.351(a). The medical provider then has twenty-one days from service of the report to file an objection, or it is waived. Id. If an objection under Section 74.351(a) is filed, and is found to be meritorious, by express wording of the statute the trial court shall dismiss the suit. Id. at § 74.351(b)(2). Dr. Harris did not bring this type of challenge and the dismissal remedy of Section 74.351(b)(2) would not apply here.
The MLIA has other provisions dealing with expert qualifications which we discuss in more detail below. When a health care provider objects to the qualifications of an expert based on one of these grounds, they must generally do so not later than the 21st day after the date they receive a copy of the proffered expert's curriculum vitae, or the date of the witness's deposition. Id. at 74.401(e)(West 2011). "The court shall conduct a hearing to determine whether the witness is qualified as soon as practicable after the filing of an objection and, if possible, before trial." Id. But this provision provides no specific authorization for dismissal of an entire suit if the expert is stricken. Likewise, TEX.R.EVID. 702 addresses expert witness qualifications, and TEX.R.EVID. 104(a) allows for a preliminary hearing on expert qualifications. The text of neither rule authorizes a trial court to simply dismiss a lawsuit if an expert does not meet those qualifications.
A prudent party might, therefore, join a motion to strike a purportedly unqualified expert with a no evidence motion for summary judgment. If the expert is essential to prove a particular element of a claim, but is found unqualified to do so, the summary judgment would be granted under the authority granted the trial court in TEX.R.CIV.P. 166a(i). That was the strategy taken by Dr. Rafael. See also Larson v. Downing , 197 S.W.3d 303, 303-04 (Tex. 2006) (defendant similarly filing contemporaneous motion for summary judgment and motion to strike).
And had Johnson raised this concern below, we might fault the trial court for simply dismissing Johnson's suit based on Dr. Harris' motion to dismiss. But Johnson's objection was not that the trial court lacked the authority to dismiss the suit. Instead, she argued that dismissal was "disproportionate and inequitable," and that she should be allowed the opportunity to obtain a new expert with a new disclosure deadline (and presumably a continuance of the trial setting). Johnson has not raised that issue on appeal.
A party presenting a complaint to an appellate court must show that "the complaint was made to the trial court by a timely request, objection, or motion." TEX.R.APP.P. 33.1(a)(1)(A). The party must state the grounds with "sufficient specificity to make the trial court aware of the complaint" unless they were otherwise apparent. Id. Borrowing language from the Court of Criminal Appeals, to preserve error a party should "let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." Lankston v. State , 827 S.W.2d 907, 909 (Tex.Crim.App. 1992) ; accord Farrell v. Farrell , 459 S.W.3d 114, 119 (Tex.App.-El Paso 2015, no pet.) ("Simply stated, complaints on appeal must have been presented to the trial court."). The concept applies to the relief accorded in a final judgment *299 or order. See Luna v. S. P. Transp. Co. , 724 S.W.2d 383, 384 (Tex. 1987) (failure to complain about how damages were apportioned in judgment waived complaint); West Tex. Utilities Co. v. Irvin , 161 Tex. 5, 336 S.W.2d 609, 610 (Tex. 1960) (failure to advise trial court of error in interest charged in judgment waived any error).
The rule makes sense here because had Johnson complained below about how the trial court disposed of the suit, Dr. Harris had an opportunity to cure the problem. The trial court heard the motion to dismiss twenty-five days prior to trial. If objection to the dismissal had been urged below, Dr. Harris could have still conceivably filed a no evidence motion for summary judgment prior to the trial date. He likewise could have simply insisted that the trial proceed and then moved for a directed verdict after Johnson rested without putting on any expert testimony.[4] In either circumstance, the resources of the trial court and this court would not have been expended on a procedural issue with a simple fix.[5] If Johnson was really concerned with how the suit was disposed, as distinct from why , she needed to raise that issue with the trial court. Accordingly, any error in dismissing the case was waived. We overrule Issue One.
STRIKING JOHNON'S SOLE LIABILITY EXPERT
In Issues Two and Three, Johnson complains that that trial court abused its discretion in striking Dr. Stern under the witness qualification standards set for experts by the MLIA (Issue Two) or Rule of Evidence 702 (Issue Three).[6] We digress briefly to define those standards.
Expert Standards in MLIA Cases
An expert in this or any kind of case must meet the basic qualification requirements *300 found in TEX.R.EVID. 702 (the expert must be qualified "by knowledge, skill, experience, training, or education."). The trial court serves a gatekeeper function to assure that the witness truly has expertise concerning the "actual subject about which they are offering an opinion." Cooper Tire & Rubber Co. v. Mendez , 204 S.W.3d 797, 800 (Tex. 2006), citing Gammill v. Jack Williams Chevrolet, Inc. , 972 S.W.2d 713, 719 (Tex. 1998). The focus is on whether the expert has the knowledge, skill, experience, training, or education regarding the specific issue before the court which qualifies the expert to give an opinion on that very subject. In re Commitment of Bohannan , 388 S.W.3d 296, 305 (Tex. 2012).
The test mandates some flexibility. In Broders v. Heise , for instance, the court held that simply because an emergency room physician was a medical doctor, he was not necessarily qualified to testify that the conduct of a neurologist caused an injury. But nor does the rule mandate that only a neurologist would be so qualified. 924 S.W.2d 148, 152-153 (Tex. 1996) ; see also Roberts v. Williamson , 111 S.W.3d 113, 122 (Tex. 2003) (pediatrician in that case was qualified to testify to cause and effect of neurological injuries ); In re Commitment of Bohannan , 388 S.W.3d at 307 (reversing trial court's exclusion of counselor who was offered to testify about future dangerousness only because witness was not a licensed psychologist or medical doctor).
The MLIA imposes additional requirements for a witness who proposes to offer opinion testimony on the accepted standards of medical care. TEX.CIV.PRAC. & REM.CODE ANN. § 74.351(a). Such an expert must meet the criteria in Section 74.401 which requires the witness to be: (1) practicing medicine at the time such testimony is given, or at the time the claim arose; (2) have "knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim;" and (3) be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care." Id. at § 74.401(a)(1)(2)(3). In determining whether a witness is qualified on the basis of "training or experience," the trial court must consider whether, at the time the claim arose or when the witness testifies, whether the expert is: "(1) board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and (2) is actively practicing medicine in rendering medical care services relevant to the claim." Id. at § 74.401(c)(1)(2). "Practicing medicine" can include training residents or students at an accredited medical school or "serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians." Id. at 74.401(b).
Standard of Review
We review a trial court's decision to strike an expert for an abuse of discretion. Broders , 924 S.W.2d at 151 ; Chester v. El-Ashram , 228 S.W.3d 909, 912 (Tex.App.-Dallas 2007, no pet.). We are directed not to disturb the trial court's decision absent a "clear abuse" of that discretion. Id. A trial court does not abuse its discretion simply because we would have ruled differently, or because we conclude the trial court committed a mere error in judgment. E.I. du Pont de Nemours and Co., Inc. v. Robinson , 923 S.W.2d 549, 558 (Tex. 1995). Rather, the test for abuse of discretion is "whether the trial court acted without reference to any guiding rules or principles." Id. Further, at the hearing challenging Dr. Stern, Johnson as the party offering his testimony carried the burden to prove he met the requirements of *301 Rule 702. Broders , 924 S.W.2d at 151. With these standards in mind we address each of Dr. Stern's opinions.
Opinions as to the Free Nipple Graft Procedure
Dr. Stern testified that there are two distinct types of breast reduction procedures-those where the nipple complex is left attached to the pedicle during the procedure and the free nipple graft technique where the nipple complex is completely removed and then reattached. Several of Dr. Stern's criticisms distinctly turn on the standard of care for the free nipple graft procedure. The specific criticisms include: (1) the informed consent for that procedure, (2) the amount of breast tissue taken during the procedure, and (3) the need for Dr. Harris to have obtained the assistance of a more qualified surgeon who knew that particular procedure. In this regard, Dr. Harris challenged Dr. Stern's qualifications based on when Dr. Stern last performed the procedure.
Presently, Dr. Stern performs two to three plastic surgeries a week. A third of these procedures involve the breasts. Of those, he does two to three breast reductions a year. But the last free nipple graft case he performed was about seven years before his deposition was taken, and thus about four years prior to the time of Johnson's procedure. In total, Dr. Stern has completed about two dozen free nipple graftbreast reduction cases in his thirty-year career. Dr. Stern trained under another physician who published and lectured on the free nipple graft technique, but that training was in the 1970's. The trial court was apparently focused on this issue, as evidenced by its questions related to how the procedure may have evolved since the last time Dr. Stern performed it.
Both parties direct us to oft quoted maxims from Larson v. Downing to guide our decision here. Johnson emphasizes Larson 's language that reviewing courts must be careful not to draw expert qualifications too narrowly. Larson v. Downing , 197 S.W.3d 303, 305 (Tex. 2006). Conversely, Dr. Harris emphasizes Larson 's language that "[c]lose calls must go to the trial court." Id. at 304. While both maxims are no doubt true, by themselves they provide a less than satisfactory basis to decide this case. See Lochner v. New York , 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937 (1905) (Holmes, J., dissenting)("General propositions do not decide concrete cases.").
Larson does, however, address the question of when an expert's knowledge might become too stale to meet the threshold for admissibility. In that case, the defendant doctor, also a plastic surgeon, was sued for allegedly botching the repair of an orbital blow-out fracture. Id. at 304. The plaintiff's expert, like Dr. Stern here, was currently licensed to practice medicine and was board certified in the relevant field. Id. But the expert last performed the particular orbital repair some fifteen years prior to his deposition, and eleven years before the alleged act of physician negligence. Id.
The trial court in Larson struck the expert and the court of appeals reversed that decision. The Texas Supreme Court focused on the MLIA's requirement that a standard of care expert must "at the time the claim arose, or at the time the testimony is given [be] actively practicing medicine in rendering medical care services relevant to the claim." Id. at 303, quoting TEX.CIV.PRAC. & REM.CODE ANN. § 74.401(c)(2). The doctor was currently practicing medicine, but the question was whether he was currently rendering the particular medical service at issue. Noting the standard of review, the supreme court upheld the trial court's exclusion. Although the case was "close", the trial court had *302 not acted without reference to the guiding rules. The trial court could have concluded that the expert's knowledge and experience were simply too far removed. Id. at 305.
Johnson argues that if the call in Larson was close based on an eleven year time gap, then the four year gap here must be on the other side of the line. The argument misses the mark given our standard of review. We doubt there is some defined time period which demarcates when a doctor's knowledge becomes too stale to assist the trier of fact. Each procedure likely differs in how rapidly medical standards are evolving. Some are being continually revamped, while others may not have changed for decades. It was Johnson's burden to satisfy the trial court that the four year time gap argued by Dr. Harris was irrelevant and she simply did not meet that burden.
No evidence was admitted at the hearing. The trial court had before it only the written report and deposition of Dr. Stern. At the deposition, the doctor produced several medical texts and journal arguments, but these were not made a part of the record, nor were most referenced by complete citation. The trial court thus had no way of knowing if Dr. Stern verified through medical literature that his last experience with the free nipple graft procedure was still relevant as of the time of Johnson's procedure. The doctor himself never testified that his knowledge of the procedure was up to date. Parties often defend their challenged experts through supplemental affidavits addressing the specific challenges being advanced, or having the experts testify live at the hearing. Neither tact was taken here. The trial court asked a legitimate question under the text of the MLIA.[7] Having not gotten a satisfactory answer, we cannot say the trial court abused its discretion in striking the procedure-specific opinions based on the staleness of the expert's knowledge.
Opinions as to Post-Procedure Care
We view Dr. Stern's opinions as to the post-procedure care in a somewhat different light. In this regard, the peculiarities of the free nipple graft procedure are less relevant. Any surgical patient is subject to infection, and any surgeon is tasked with monitoring the patient after surgery to detect signs of infection or other complications. The question before us is whether Dr. Stern was qualified to opine that Dr. Harris breached the standard of care for a surgeon in post-surgical care, and whether the claimed breach was the proximate cause of any harm to Johnson. If the trial court erred in striking this opinion, we also *303 consider whether the error was harmful in the sense that Dr. Stern actually made out a case for post-procedure negligence against Dr. Harris.
Because Dr. Harris only saw Johnson on the April 5th and April 11th visits, and admitted her on the later visit, we focus on what allegations Dr. Stern actually made about the April 5th visit. Those criticisms all relate to how Dr. Harris responded to what may have been an evolving infection. Dr. Harris suggests we end the discussion there because Dr. Stern is not an infectious disease expert. Dr. Stern acknowledged in deposition that he is not an infectious disease specialist and if he consulted with such a specialist, he would typically defer to the specialist on antibiotic choice and method of delivery. That admission falls a bit short of disqualifying Dr. Stern from possessing relevant knowledge about the cause and treatment of infections. The fact that others might be more qualified on infection issues does not negate Dr. Stern's own fund of knowledge on that topic. Medical knowledge sometimes overlaps different specialty areas, and the relevant inquiry is whether the "subject of inquiry is common to and equally recognized and developed" in both fields. Hart v. Van Zandt , 399 S.W.2d 791, 797-98 (Tex. 1965) ; see also Chester , 228 S.W.3d at 912-13 ; Chavira v. Darden , No. 05-12-01380-CV, 2013 WL 2641313, at *3 (Tex.App.-Dallas 2013, no pet.) (mem.op.)(trial court did not abuse discretion in finding that OBGYN board certified doctor had expertise to testify to standard of care for handling of miscarriage by emergency room physician). The record established such an overlap here, as Dr. Stern testified that surgeons will at times treat post-surgical infections themselves, without the assistance of an infectious disease specialist.
The question parallels the facts in Keo v. Vu , 76 S.W.3d 725 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). There, the plaintiff sued a plastic surgeon over a nose implant that later needed to be surgically re-visited, and then became infected. Id. at 729. The plaintiff designated an ear and throat surgeon who had performed the procedure in the far past, and who presently performed a variety of surgeries on the head and neck. Id. at 732-33. The court found the expert qualified because his testimony related to the standard of care for surgery on the head and neck generally or matters common to all surgeries, including the adequacy of pre-operative and post-operative counseling and the treatment of post-operative infections. Id. For the same reasons, Johnson proved that Dr. Stern was qualified in the area of post-surgical follow up of a patient having a breast procedure. If the trial court excluded Dr. Stern's general opinions on post-procedure follow up because he had not done this particular procedure in some time, it would have erred in doing so. The record showed Dr. Stern regularly did surgical procedures, which require post-surgical wound checks.
But even if the trial court erred in that respect, the error was harmless. Reading Dr. Stern's report in the context of his deposition, there is no specific criticism about Dr. Harris's post-surgical care on the April 5th visit. That visit was documented by a nursing note stating that Johnson had a purulent drainage from her right nipple. Dr. Harris already had Johnson on a broad spectrum antibiotic, Keflex, and he prescribed her additional Keflex on that visit. Dr. Stern testified that he would have changed from Keflex to another type of broad spectrum antibiotic if there was an infection persisting for six days after surgery. At best, Dr. Stern's testimony conflicted as to whether there was infection by that time. At one point he agreed that he could not state that there was an *304 infection by the time of that visit (or even any necrotic tissue). From another portion of his testimony, he believed there was "some cause for concern" based on the purulent drainage from the site. But it is clear from his testimony that the time for additional steps was at the next visit, which was handled by Dr. Rafael:
Q. So based on [Dr. Harris'] April 5th examination, you wouldn't say that his breach-or he breached the standard of care at that visit if tissue necrosis was not even suspected?
A. Yeah, I mean, there was some indication, but-again, based on the nurse's note about some drainage, but it's all very sketchy and you can't-I mean, you can't form an opinion based on what you see on the chart. But there might have been, you know, some reason for concern. It says that Dr. Harris prescribed additional Keflex, so he was concerned.
....
Q. Is it possible that a CBC draw should have happened on April 5th, the first postoperative visit?
A. Try and put myself in their shoes. The 5th did not sound-it sounded like something was developing, but it did not sound that it was as serious as what it was three days later.
Q. Okay. So something happened within those three days?
A. Yes.
Additionally, Johnson made no attempt to show that the type of infection she actually had, based on the eventual cultures, was untreatable with Keflex, or that it would have been more treatable with an earlier round of some other antibiotic. Dr. Stern did testify to the obvious proposition that the earlier the diagnoses and treatment of an infection, the better the possible outcome. But his testimony about Johnson's specific circumstances in this regard was limited to possibilities. Testimony about possibilities would not have supported a verdict. W.C. LaRock, D.C., P.C. v. Smith , 310 S.W.3d 48, 58 (Tex.App.-El Paso 2010, no pet.) (" 'Perhaps,' 'possibly,' 'can,' and 'could' indicate mere conjecture, speculation or possibility rather than qualified opinions based on reasonable medical probability."); Campos v. Ysleta Gen. Hosp., Inc. , 836 S.W.2d 791, 794-95 (Tex.App.-El Paso 1992, writ denied) (doctor's testimony that treatment might have saved patient was not probative evidence of proximate cause).
Dr. Stern's report also seemingly criticizes Dr. Harris for not taking a fluid culture on the April 5th visit, but his deposition testimony clarifies this criticism is really focused on the April 8th visit, which was handled by Dr. Rafael. Even at that, Dr. Rafael contended that there was no fluid available to be drawn for culturing. While Dr. Stern disagreed with Dr. Rafael in that regard, Dr. Stern never testified to what an earlier culture would have shown, or how it would have specifically changed the outcome in this case.
The testimony regarding any breach by Dr. Harris on the April 5th visit would not have supported a verdict and thus even if Dr. Stern were qualified to provide the excluded opinions, Johnson has shown no reversible error. TEX.R.APP.P. 44.1(a)(1)
Opinions Regarding Anemia
Johnson also offered Dr. Stern's opinion that the surgery should have been delayed until her underlying anemia was treated. The procedure here was elective, and the only harm in delaying the procedure might have been additional neck, shoulder and back pain. Like the opinion about post-procedure care, the qualifications to offer the opinion turn on Dr. Stern's general knowledge of prequalifying any patient for surgery, rather than his specific knowledge of the free nipple *305 graft procedure. There is no indication in the record that the anemic condition of a patient having the free nipple graft procedure is any different from any patient having any other surgical procedure. Dr. Stern was certainly qualified in the general area of plastic surgery. But again, any error in excluding this opinion was harmless because Dr. Stern did not testify that the anemia caused the ensuing infection:
Q. All right. I think we're on the same page. You agree that her anemia -I'm saying anemia. The jury can decide whether or not she was truly anemic. But that didn't cause her infection?
A. Did not cause it.
Rather he termed it a contributing factor that "may have contributed or interfered with the patient's ability to respond to it." Dr. Stern never testified that in reasonable medical probability she suffered any distinct injury from this compromised condition. The closest Dr. Stern came in his deposition was this exchange:
Q. And in Item No 1 you're critical of Dr. Harris for performing surgery on Ms. Johnson given her, what you perceived to be, anemia-
A. Yes.
Q.-or anemic status? Nowhere in this item or this paragraph do you say that her anemia proximately caused her ultimate injuries in this case?
A. Okay. Well, I-as some of those articles that I provided, there apparently is a relationship between preoperative anemia and subsequent development of infection. So in that sense, the anemia may have-may have been a proximate cause.
This statement falls short of that needed to support causation. Simpson v. Coats , 05-95-01035-CV, 1996 WL 317075, at *4 (Tex.App.-Dallas June 11, 1996, writ denied) (not designated for publication)("Calkins's and Spoll's statements that Mrs. Simpson's treatment may have been a proximate cause reflect a mere possibility, not reasonable medical probability.")[Emphasis in original).[8] Dr. Stern's opinion that anemiamay have been a proximate cause here likewise falls short of establishing causation.
We conclude that the trial court did not abuse its discretion in finding Dr. Stern unqualified to express some of the opinions that he did, or for those he could have expressed, the excluded opinions did not establish a viable claim (and thus any error in excluding it was harmless). Accordingly, we overrule Issues Two and Three and affirm the trial court's judgment below.

We refer to Dr. Rafael and his entity, Peter Rafael I, M.D., P.A. collectively as Dr. Rafael. Another named defendant, American Institute for Plastic Surgery, was non-suited with prejudice in September 2013. Plaintiff's First Amended Petition, the last live pleading, deletes that entity from the case style and no allegation is made against it. Nonetheless, a host of subsequent pleadings and orders filed in 2014 and 2015, including the final judgment and the notice of appeal, list that entity as a party in the caption, unnecesarily so in our view.

Dr. Harris did move for a partial motion for summary judgment on Johnson's claim for gross negligence and exemplary damages. That motion was separately granted and Johnson does not contest that order on appeal.

Johnson claimed she received neither a copy of the pleading itself, nor notice of the hearing on the motion. Dr. Rafael responded to that claim attaching proof of electronic and facsimile delivery of the motion and the setting. No issue is raised as to service of Dr. Rafael's summary judgment on appeal and Johnson's request for relief in her reply brief asks that we affirm the summary judgment as to Dr. Rafael and his entity. We do so, and only discuss the claims against Dr. Rafael to place the remaining issues in context.

Unless the matter at issue was within lay knowledge, some expert testimony was essential to Johnson's case on the standard of care and causation. W.C. LaRock, D.C., P.C. v. Smith , 310 S.W.3d 48, 56 (Tex.App.-El Paso 2010, no pet.) ; Linan v. Rosales , 155 S.W.3d 298, 302 (Tex.App.-El Paso 2004, pet. denied). The uniqueness of this procedure places this case in the class of cases requiring expert testimony. See Bradley v. Rogers , 879 S.W.2d 947, 954 (Tex.App.-Houston [14th Dist.] 1994, pet. denied) (discussing burden in failure to diagnosis post liposuction infection).

In a similar situation, a trial court that had stricken a necessary expert on the eve of trial entered a directed verdict the day before trial was set to begin, apparently with acquiescence of the plaintiff, so that the issue could proceed to the court of appeals without the parties wasting additional resources.Burks v. Duncan , 05-14-00921-CV, 2016 WL 3346056, at *2, n.3 (Tex.App.-Dallas June 15, 2016, no pet. h.) (mem. op.)(not designated for publication).

Dr. Harris spends considerable time in his briefing arguing that the challenge to Dr. Stern also included the reliability of his opinions, and because Johnson has not addressed that issue on appeal, she has failed to challenge all possible grounds for upholding the trial court's order-generally a fatal error for appellants. See RSL Funding, LLC v. Pippins , 499 S.W.3d 423 (Tex. 2016) (failure to challenge all basis for order below resulted in affirmance). In our view, however, both of the doctor's motions challenged only Dr. Stern's qualifications, and not his methodology. Dr. Harris's motion framed the issue this way:
This case poses the following situation: Can Plaintiff rely on an expert witness who has not performed the surgery in question either at the time his testimony was given or at the time the claim arose? Moreover, can that same expert opine on the free nipple graftbreast reduction surgical technique when he has never written about, published or taught such techniques? Finally, can that expert opine as to the cause of Plaintiff's post-op infection when he is admittedly not an infectious disease doctor or specialist?
Likewise, all of the headings in his motion address the qualifications of Dr. Stern. We accordingly reject Dr. Harris' claims that the appeal should be decided on the basis of briefing deficiencies.

This exchange is taken from the hearing below:
THE COURT: Does your witness know what may or may not have changed in the performance of that procedure since the last time your witness did that procedure? What has changed about the equipment used? The science known behind it? The success rate? What type of stitches are used? Do they use stitches or glue? I mean these are-I don't know, but it seems like the kind of things that might change. I mean, even the little laser eye surgery. The way they do that these days is, like, vastly different than it was 15 years ago and probably different than it was a year ago.
[JOHNSON'S COUNSEL]: Well, my understanding I-I would say on the first-as a threshold issue, I'm not the doctor himself, and I can only sort of guess as to how he would respond to that question. But given the testimony that he's already given and some of the scientific research and documents that I've reviewed, it seems that the way that surgery is being done, is essentially-and I don't want to-I'm sure there are all small changes, but it's essentially the same as it has been for a while. You (sotto voce) the breast; you cut like this; you take off the nipple; you pull out the stuff and sew it back up.

This case was transferred to us from the Fifth Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. See Tex.Gov't Code Ann. § 73.001 (West 2013). We follow the precedents of that court to the extent they might conflict with our own. See Tex.R.App.P. 41.3.