NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2213-23

IRA WEISSMAN,

     Plaintiff-Appellant,

v.

SEAN LI, M.D., PREMIER
PAIN CENTER, LLC, and
SPECIALTY ANESTHESIA
ASSOCIATES, LLC,

     Defendants-Respondents.

_____

Argued October 20, 2025 – Decided December 5, 2025

Before Judges Sabatino, Walcott-Henderson and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-4708-21.

Michael Wiseberg argued the cause for appellant (The Dratch Law Firm PC, attorneys; Michael Wiseberg, on the brief).

Beth A. Hardy argued the cause for respondents (Farkas & Donohue, LLC, attorneys; Evelyn C. Farkas, of counsel; Christine M. Jones, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

In this medical malpractice case arising out of a spinal surgery, the trial court excluded the opinions of plaintiff's liability expert, a board-certified anesthesiologist and pain management specialist, on issues of medical causation. The court barred the expert from opining on causation issues for two reasons.

First, at his discovery deposition, the expert agreed with defense counsel's question that he would "defer to a neurologist" on whether the surgery caused plaintiff to experience symptoms of pain in his leg and foot. The court treated that deposition answer as a concession by the expert that he is unqualified to opine on the causation issues in this case.

Second, aside from the expert's supposed concession of a lack of credentials, the court barred his testimony about causation because his expert report conveyed inadmissible net opinions on the subject.

Having excluded the anesthesiologist on these grounds, the court denied plaintiff's request to extend discovery and enable him to present a neurologist as a substitute causation expert. The court therefore granted defendants summary judgment.

Plaintiff now appeals. We affirm, because the trial court did not abuse its discretion in either excluding the expert's assertions about causation or

A-2213-23

thereafter declining to reopen discovery on reconsideration when a new expert was tendered.

Upon considering the divergent outcomes in cases from other jurisdictions, we address the expert deference issue as a matter of first impression under New Jersey law. We decline to adopt a per se rule that would treat a testifying expert's acknowledgment to "defer" to another expert who has a different or overlapping specialty as a categorical admission that the testifying expert lacks the qualifications to render opinions about the subject. Instead, the context of the "deferral" must be evaluated on a case-by-case basis.

Regardless of the "deferral" issue, the trial court reasonably found that plaintiff's expert's views about causation did not comport with the net opinion doctrine. We sustain the trial court on that basis alone and uphold summary judgment.

I.

In August 2019, plaintiff Ira Weissman underwent a spinal surgical procedure known as minimally invasive lumbar decompression ("MILD"). Within two days after undergoing the surgery, plaintiff began to experience debilitating pain in both his right leg and foot.

Plaintiff argues that the surgeon, Sean Li, M.D., caused a nerve injury that directly produced his leg and foot pain. He contends that Dr. Li deviated from medical standards of care in performing the MILD surgery on not only a vertebral level (L4-5) that he had consented to before the operation, but also on an unconsented level (L5-S1) in a manner that allegedly caused the injury.

Plaintiff had further surgery in December 2021 that improved his condition, but continued to need a cane to walk. Plaintiff sued Dr. Li for medical negligence and Dr. Li's co-defendant employers on a theory of vicarious liability.

Defendants retained two experts to rebut plaintiff's malpractice claims: a physician who is board-certified in anesthesiology and pain management, and a neurologist.[1] The first of those defense experts opined that Dr. Li did not transgress professional standards in performing the MILD procedure at the L5/S1 level, asserting that "[i]t is within the standard of care to modify a method in surgery based on intraoperative imaging." That expert further noted that plaintiff had "extensive . . . spinal and neurological abnormalities" before the surgery, which could account for his symptoms.

---

[1] The record supplied to us does not reveal whether that defense expert is board certified in neurology.

A-2213-23

The defense expert in neurology, meanwhile, opined that the MILD procedure did not cause plaintiff's leg and foot problems, mainly because there was no evidence that the surgery penetrated the thecal sac, which contains the S1 nerve root. In essence, he asserted that it was anatomically impossible for plaintiff to experience concentrated pain at the sole of his foot due to the surgery.

Both defense experts found it significant that plaintiff did not report symptoms of leg or foot pain until about two days after the surgery. The neurologist specifically opined that "if the S1 nerve root was injured during the MILD procedure, [plaintiff] would have felt it upon awakening from the anesthesia. Instead, it started [two] days later after walking a long distance the day after the procedure."

In granting summary judgment to defendants, the motion judge concluded in an oral opinion that plaintiff's sole liability expert, Frederic Gerges, M.D., was (1) unqualified to testify as to causation and (2) even if he were qualified, his opinion on causation was an inadmissible net opinion. Because plaintiff lacked admissible evidence showing a causal link between the allegedly negligent surgery and the injury, the judge granted summary judgment.

Plaintiff moved for reconsideration, tendering a backup report of a previously undesignated expert, a neurologist, to provide a supportive opinion

on causation. The judge denied the motion, noting the discovery end date had expired and that no exceptional circumstances had been shown to justify its extension.

On appeal, plaintiff argues the trial court erred in excluding his expert and in granting summary judgment because Dr. Gerges is qualified to testify on causation and his opinion on causation is not a net opinion. Alternatively, plaintiff argues that if we uphold the expert ruling as to Dr. Gerges, there are exceptional circumstances that warranted the extension of discovery to allow the proposed neurologist's report and testimony.

II.

We are guided by familiar standards in reviewing the trial court's evidentiary rulings. The admissibility of expert testimony "is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015). The court's determination "is entitled to deference on appellate review" subject to the abuse of discretion standard. Id. at 52-53. Such a determination generally should be reversed if it "'was so wide off the mark that a manifest denial of justice resulted.'" Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)). Nevertheless, we apply de novo review to the trial court's rulings on questions of law.

Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

N.J.R.E. 702 governs the admissibility of expert testimony. It imposes three requirements: "'(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.'" Townsend, 221 N.J. at 53 (quoting Creanga v. Jardal, 185 N.J. 345, 355 (2005)). The main issues on appeal concerning Dr. Gerges's qualifications and causation opinions only involve the third element.

### A.

Indisputably, Dr. Gerges has considerable training and experience in the fields of anesthesia and pain management. As a board-certified anesthesiologist, he is plainly familiar with the nervous system and its effect on pain. His advanced training as a pain management specialist, which required an additional year of supervised study, further built upon that knowledge. At the time of his expert report in this case, Dr. Gerges served as Director of the Pain Management Center and Program Director of the Pain Medicine Fellowship at St. Elizabeth's Medical Center. He was also an assistant professor of anesthesiology at the Tufts University School of Medicine.

A-2213-23

Notably, Dr. Gerges has performed the MILD procedure on many patients. Given that experience, he expressed familiarity with the potential risks and complications of the procedure, including nerve damage. His expert knowledge about the procedure appears to be substantial. In fact, defendants have not contested his qualifications to opine in this case about alleged deviations from the standards of care for performing the MILD procedure.

With respect to the disputed issues concerning whether the MILD surgery and the decision to operate at the L5/S1 level caused plaintiff's post-operative leg and foot pain, Dr. Gerges seemingly would appear to have ample training and experience to offer opinions on that subject. However, that premise is complicated by Dr. Gerges's deposition testimony.

Under questioning by defense counsel, Dr. Gerges testified that nerve injury is a recognized risk of the MILD procedure and emphasized the timing component.

> Q: And can we agree that with the MILD procedure, one of the risks could be nerve injury. Correct?
>
> A: Yes, correct.
>
> . . . .
>
> Q: Okay. So if we put the two together, we can agree that <u>Mr. Weissman in your opinion experienced a nerve</u>

injury from the MILD procedure. True? That's what you believe, or do you not – are you not sure?

A: You can't prove it 100 percent, but it's a consequence of the surgery.

Q: All right. So let me ask you, Doctor, because you were candid enough to tell me that you don't hold yourself out as an expert in neurology, would I be correct that given the multiple comorbidity conditions that this patient had, you can't state within a reasonable degree of medical probability that the complaints Mr. Weissman has relative to the bottom of his foot are related to any deviations from standard of care. Right?

A: Well, I mean, there's the timing component, the spatial[2] timing component basically from the fact that he had the surgery and after the surgery he start[ed] complaining of this worsening left foot pain, so basically that time makes it more into looking whether it's surgery related or not. If it's not within that time [frame, it] basically may be not related. If it's been going on forever and continues to go on after surgery is sort of different than it's coming on, becoming more intense, and worsening after surgery.

[(Emphasis added).]

Of pivotal importance to the motion judge was Dr. Gerges's agreement with defense counsel that he "would defer to a neurologist" as to the question of whether plaintiff's complaints about his leg and foot were caused by his MILD

---

2   Dr. Gerges did not explain what exactly he meant by "spatial" timing component.

surgery:

> Q: Would I be correct, Doctor, that you would defer to a neurologist in terms of whether or not Mr. Weissman's complaints on the bottom of his foot are related to the surgery or not?
>
> A: <u>Yes, I would defer to a neurologist</u>.
>
> Q: Okay. So fair to say that your understanding of your role in this case as an expert is really to comment on what your opinions are in terms of deviation from standard of care. Correct?
>
> A: Deviation from the standard of care in two circumstances, in obtaining the informed consent, in the informed consent form – operating on L4-5 level in the informed consent, and doing L5-S1 level, that's one deviation. And the second one is the non-indicated L5-S1 level to be operated on with MILD.
>
> Q: I understand those are your opinions and maybe you just didn't understand my question, because <u>it could short-circuit the deposition is what I'm trying to do</u>. So if I'm understanding, <u>your role in this case</u> is to give us your opinions as a pain management specialist <u>as to deviation from standard of care</u>. Correct?
>
> A: <u>Yes</u>.
>
> Q: And I'm correct that in terms of <u>what these alleged deviations caused in terms of any possible neurological damage</u> to the patient, <u>you would defer to a neurologist because that's not your area of specialty</u>. Correct?
>
> A. <u>Yes</u>.
>
> [(Emphasis added).]

A-2213-23

Defendants argue, and the trial court agreed with them, that these responses by Dr. Gerges amount to a concession that he isn't qualified to render opinions in this case about medical causation because he is not a neurologist. That reasoning places great emphasis on the word "defer," a word chosen by the defense attorney in forming the questions she posed.

No one asked Dr. Gerges to define the term "defer" or what he understood the word to mean in this context. The questioner did not define the term either. Plaintiff's counsel did not object to the question. Nor did plaintiff's counsel ask any clarifying questions of the expert after defense counsel had finished her questioning of Dr. Gerges.

Lacking any such definition or clarification, we are left to consider the common usages of the word "defer." Among the most pertinent definitions, Merriam-Webster's Collegiate Dictionary 326 (11th ed. 2014), defines the word as meaning "to submit to another's wishes, opinion, or governance usu[ally] through deference or respect." Similarly, Black's Law Dictionary 486 (12th ed. 2024) defines "defer" as "[t]o show deference to (another); to yield to the opinion of."

Applying these published notions of the word "defer" to connote yielding or submitting to the opinions of another person, it might be inferred that Dr.

11

Gerges was acknowledging to his questioner that he is not a neurologist, and that only a neurologist is qualified to render opinions about whether the MILD procedure medically caused plaintiff's foot and leg pain. But that inference is not inexorable or absolute.

It could be, for instance, that Dr. Gerges simply was expressing professional respect for the views of neurologists and their specialty. See Merriam Webster's Collegiate Dictionary,326 (noting that the term defer can convey "respect"). He might also have been acknowledging that, as a board-certified anesthesiologist and pain management doctor, he is not as qualified as a neurologist to render opinions about the cause(s) of a patient's pain. That does not necessarily mean, as the motion judge remarked in his oral opinion, that Dr. Gerges was "basically disqualifying himself" through conceding that he doesn't have sufficient credentials and experience to render his own opinions on what caused plaintiff's post-surgical symptoms. Yet, despite twice acknowledging that he would defer to a neurologist, Dr. Gerges nonetheless advanced his own contrary opinions on what caused plaintiff's condition.

We have been pointed to no reported New Jersey opinions that address this specific issue focusing on the import of the term "defer" when used by an expert witness, nor have we otherwise found any. We have located a few

12

published opinions from other jurisdictions that consider this issue, although such cases have produced mixed results.

At least two appellate cases have allowed trial courts to disqualify experts upon an admission of deferral. See, e.g., Talavera v. Wiley, 725 F.3d 1262, 1274 (10th Cir. 2013) (upholding the trial court's determination that a doctor who deferred to the expertise of a neurosurgeon on causation disqualified herself from expressing an opinion on the subject); Humphrey v. Emory Clinic, Inc., 892 S.E.2d 569, 576 (Ga. Ct. App. 2023) (holding that the trial court did not abuse its discretion in excluding a doctor's causation opinions because the doctor said she would defer to infectious disease doctors). Other jurisdictions have reached a contrary outcome. See, e.g., Milliken v. Dartmouth-Hitchcock Clinic, 914 A.2d 1226, 1231 (N.H. 2006) (upholding the trial court's determination to allow a maternal fetal medicine specialist to testify about the timing of an injury, notwithstanding her admission of deference to pediatric neurologists on this issue); Johnson v. Harris, 546 S.W.3d 293, 303 (Tex. App. 2017) (recognizing that an expert physician's statements that he would defer to infectious disease specialists does not automatically disqualify the expert from testifying about the cause and treatment of infections).

A-2213-23

These split outcomes signal that the proper judicial interpretation of the term "defer" by an expert witness is highly contextual. We do not endorse a blanket rule that an expert's acknowledgment of "deference" to another expert who has a different or overlapping specialty always means that the testifying expert is conceding a lack of qualifications and must be precluded from presenting opinions on the subject. Nor are defendants in this case arguing for such a per se approach.

The trial court's evidentiary ruling that Dr. Gerges conceded a lack of expertise at his deposition was one of the grounds on which the court granted summary judgment. In a summary judgment posture, we must make all reasonable inferences in favor of the non-moving party, here being the plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). Viewed through that prism, we decline to rest our analysis on Dr. Gerges's alleged concession.

### B.

We turn to the trial court's separate basis for disallowing Dr. Gerges's expert testimony on causation: the net opinion doctrine.

As explained in our case law, N.J.R.E. 703 disallows expert witnesses from offering net opinions, which are "'conclusions that are not supported by

14                                                                    A-2213-23

factual evidence or other data.'" Townsend, 221 N.J. at 53-54 (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). Expert opinions must be excluded if they are "'based merely on unfounded speculation and unquantified possibilities.'" Id. at 55 (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)). Experts need to "'identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Ibid. (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). In short, they must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).

That being said, we are mindful that, as the Court observed in Townsend, "[t]he net opinion rule is not a standard of perfection. The rule does not mandate that an expert organize or support an opinion in a particular manner that opposing counsel deems preferable." Ibid.

Here, the net opinion analysis concerns Dr. Gerges's reasoning to support his opinion that plaintiff's post-surgery leg and foot pain were caused by Dr. Li's alleged deviations from standards of care. In his expert report, Dr. Gerges stated:

Two days following the two-level decompression, Mr. Weissman developed severe pain and burning in his right foot. On 10/16/2019 an electromyography of the right lower extremity performed by Dr. David Frank demonstrated chronic Right L5 and acute superimposed on a chronic S1 radiculopathy as well as a sensorimotor axonal polyneuropathy. The fact that an acute S1 radiculopathy was detected on Dr. Frank's EMG test proves that S1 nerve irritation and subsequently the development of an acute superimposed on a baseline chronic S1 radiculopathy is a direct result of the MILD procedure and more likely than not because it was performed at the L5-S1 interspace. The two-month period between surgery and Dr. Frank's EMG findings of an acute S1 radiculopathy proves the causal relationship between MILD and the acute S1 radiculopathy. Furthermore, such injury at right S1 nerve was substantiated by another EMG performed three months later by another provider confirming the S1 radiculopathy.

The motion judge concluded this explanation of causation did not sufficiently present the "why and wherefore" required under the net opinion doctrine. The judge did not misapply his discretion in reaching that evidentiary ruling, nor did the judge misapply the legal requirements of the doctrine.

Defendants maintain that a critical shortcoming of Dr. Gerges's report is that it does not explain anatomically the causal mechanism as to how the MILD procedure on L5-S1 in this case produced S1 radiculopathy, which allegedly resulted in a weakness in plaintiff's leg as well as pain in his foot. An expert's explanation of a causal mechanism is important when it is not obvious to a

16

layperson how an action or inaction can cause an injury.

To support his opinion on causation, Dr. Gerges pointed to several facts: (1) plaintiff's symptoms two days after the surgery; (2) the EMG conducted two months after the surgery detecting the S1 radiculopathy; (3) the proximity of the MILD procedure on L5-S1 to the S1 nerve root; (4) the decompression of L5-S1 was "unsuccessful;" and (5) nerve injury is a recognized risk of the MILD procedure. None of these facts explain what Dr. Li specifically did during the surgery to cause damage to the S1 nerve root.[3] That lack of explanation of the mechanism is important.

As defendants have noted, there is evidence in the record that plaintiff suffered from a documented preexisting condition. In medical negligence cases in which, as here, the patient has a preexisting condition, the first step to analyze proximate causation is whether "there is evidence 'demonstrating within a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by a preexistent condition.' Once that requirement has been satisfied, the jury next must determine whether the increased risk was a

---

[3] Dr. Gerges suggested that the "unsuccessful," or partial decompression, of the L5-S1 spinal level could be evidence of a causal mechanism, but, with all due respect, that observation did not explain how that conduct damaged the S1 nerve root. He did not explain how the attempted removal of the hypertrophied ligament at the L5-S1 level could have damaged plaintiff's S1 nerve root.

A-2213-23

substantial factor in causing the ultimate harm." Reynolds v. Gonzalez, 172 N.J. 266, 282-83 (2002) (quoting Scafidi v. Seiler, 119 N.J. 93, 108-09 (1990)); see also Model Jury Charges (Civil), 5.50A, "Duty and Negligence" (Mar. 2002) (requiring a jury to determine whether the underlying negligence, an analysis which requires a comparison of the defendant's conduct against the standard of care for the average specialist in the field, in a medical malpractice case "was a substantial factor" in causing the plaintiff's injury).

Dr. Gerges noted that nerve injury is a generally recognized risk of the MILD procedure, but he did not explain how the risk of such harm in plaintiff's case was materially increased by Dr. Li's alleged surgical deviations. Additionally, Dr. Gerges did not explain how the S1 radiculopathy, which was detected months after the surgery, caused plaintiff's right leg pain or the concentrated pain in the plantar area of his foot. His brief discussion of causation was largely a temporal one, resting upon what he referred to as the "timing component" of plaintiff's symptoms and conditions. But the association or coincidence of the timing doesn't suffice to prove causation. See State v. Olenowski, 255 N.J. 529, 610-12 (2023) (noting the important differences of association, consistency, or coincidence from causation).

In short, Dr. Gerges did not sufficiently elaborate upon, in compliance

with the net opinion doctrine, how and why the MILD operation on L5-S1 caused the S1 radiculopathy and the pain in plaintiff's leg and foot.

For these reasons, we conclude the trial court's net opinion ruling was not "'a manifest denial of justice.'" Rodriguez, 237 N.J. at 57 (quoting Griffin, 225 N.J. at 413). The court did not abuse its discretion in excluding Dr. Gerges's net opinion addressing causation. Ibid.

Consequently, because medical causation of injury is an essential facet of a medical malpractice case, Komlodi v. Picciano, 217 N.J. 387, 417-18 (2014), the trial court appropriately granted defendants' motion for summary judgment, even viewing the record de novo in a light most favorable to plaintiff. See Statewide Ins. Fund v. Star Ins. Co., 253 N.J. 119, 124-25 (2023) (prescribing de novo appellate review of summary judgment).

## III.

Lastly, we briefly address plaintiff's argument that the trial court should have granted his motion for reconsideration and, as part of that disposition, extended discovery to enable plaintiff to rely on the opinions of his late-obtained neurologist expert.

In considering this issue, we are cognizant that, in a colloquy at the end of the motion argument after the court announced it was excluding Dr. Gerges's

opinions on causation, the trial court did suggest to plaintiff that, if he were to file a motion for reconsideration, he might wish to consider retaining a neurology expert to remedy the shortcomings of Dr. Gerges's opinion. The court made explicitly clear in its colloquy, however, that it was not making "any representations" or issuing "an advisory opinion." The court noted that the Civil Presiding Judge would need to approve a reopening of discovery, and that it was not "intimat[ing]" that such a reopening would be granted.

Thereafter, plaintiff moved for reconsideration and tendered the report from his proposed substitute expert on causation, a neurologist. Defendants, predictably, opposed the motion.

On reflection, the trial court denied the motion, after weighing the parties' competing interests. The court underscored the potential unfairness to defendants in giving plaintiff a second chance to bolster his case after the discovery end date had expired and after the motion practice on expert admissibility and summary judgment had been completed.

The court reasonably determined on reconsideration that its original ruling was not based on "a palpably incorrect or irrational basis," nor had it "failed to appreciate the significance of probative, competent evidence." Kornbleuth v. Westover, 241 N.J. 289, 301 (2020) (quoting Guido v. Duane Morris LLP, 202

N.J. 79, 87-88 (2010)); <u>see also</u> <u>R.</u> 4:49-2. The court also reasonably determined that plaintiff had not demonstrated "exceptional circumstances" to justify the reopening of discovery. <u>R.</u> 4:24-1(c); <u>see also</u> <u>Rivers v. LSC P'ship</u>, 378 N.J. Super. 68, 79 (App. Div. 2005). We decline to second-guess those determinations, although we understand plaintiff's disappointment in having secured a second expert for naught.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division