JUSTICE SOLOMON delivered the opinion of the Court.
**41 While shopping in a store owned and operated by defendant Wal-Mart Stores, Inc., plaintiff Alexandra Rodriguez was struck by a falling clothing display rack. She later brought a negligence suit against Wal-Mart. In this appeal, we are asked to determine whether defendant's medical experts should have been precluded from using terms like "somatization"[1] and "symptom magnification" in their trial testimony. We also consider whether the trial court abused its discretion by admitting into evidence at trial plaintiff's past medical history, including her psychiatric history.
We conclude that the admissibility of medical expert testimony utilizing terms such as "somatization" and "symptom magnification" must be determined by trial courts on a case-by-case basis, consistent with N.J.R.E. 403, and we find no abuse of discretion in the trial court's allowing use of those terms under the circumstances of this case. Although use by medical experts of the term "malingering" causes heightened concern since it may improperly implicate a plaintiff's credibility, the term "malingering" was never **42 used by defendant's medical experts or by defense counsel during trial, and we disagree with the Appellate Division's equation of the terms used by the experts with that term. We also disagree with the panel's determination that one of defendant's experts, who is a neurologist rather than a mental-health specialist, was not qualified to testify about somatization or symptom magnification.
We concur, however, with the Appellate Division's determination that the trial court did not abuse its discretion in admitting into evidence at trial plaintiff's past medical history, including her psychiatric history, after conducting an N.J.R.E. 104 hearing, in which the court found that the probative value of plaintiff's past medical history was not substantially outweighed by the risk of undue prejudice.
We therefore affirm in part and reverse in part the judgment of the Appellate Division, and we reinstate the jury's verdict of no cause of action.
*118 I.
Resolution of the issues before this Court requires that we review in some detail the testimony of plaintiff, the parties' experts, and the trial court's rulings. We begin with the testimony of plaintiff and plaintiff's experts as reflected in the trial record.
A.
While pushing a shopping cart in the ladies' department at Wal-Mart, plaintiff "brushed" a clothing display rack that started to fall.[2] The rack struck Rodriguez's right elbow and hand, and she **43 used her elbow and hand to prevent the rack from pushing her to the ground. One of plaintiff's children, customers, and the store manager lifted the rack off of plaintiff.
Rodriguez claimed that she immediately experienced pain in her neck and back but declined medical attention because her three children were with her. Later that day, plaintiff sought treatment at a local hospital emergency room. Approximately two-and-a-half weeks later, plaintiff sought treatment for ongoing pain with Dr. Steven Kahn. Dr. Kahn referred plaintiff to a pain management specialist, who administered epidural steroidal injections. Rodriguez reported only temporary relief from the injections.
Because conservative treatment failed, Dr. Kahn performed nerve decompression surgery on plaintiff's wrist and elbow. When her symptoms recurred, Dr. Kahn referred plaintiff to Dr. Phillip Getson, a physician specializing in the treatment of Chronic Regional Pain Syndrome (CRPS).[3] Dr. Getson diagnosed plaintiff with CRPS. Six months after the Wal-Mart incident, but before her CRPS diagnosis, plaintiff was involved in an automobile accident ("the automobile accident").
**44 Later, Rodriguez filed a complaint asserting that Wal-Mart's negligence in constructing and maintaining the clothing rack caused her pain and CRPS.[4] Plaintiff filed a pre-trial motion to preclude Wal-Mart from referencing the automobile accident *119 as a potential cause of her injuries, but the court denied the motion and permitted Wal-Mart to refer to the automobile accident "to challenge the medical opinions provided by plaintiff's medical experts citing to the Wal-Mart incident as the sole basis for her complained maladies."
Additionally, relying upon N.J.R.E. 401 and 403, plaintiff's counsel moved in limine to exclude testimony -- including testimony by her treating orthopedic surgeon, Dr. Kahn -- about plaintiff's prior medical treatment for obstetric/gynecological issues, chronic abdominal pain,[5] and psychiatric and psychological disorders.[6] Citing N.J.R.E. 403, plaintiff's counsel argued that this evidence had little probative value and that the risk of undue prejudice and confusion of the issues far outweighed its probative value. Noting that Rodriguez "does have a history, a medical history that has to be considered," the court denied the motions in limine and allowed testimony about plaintiff's prior medical treatment for obstetric/gynecological issues, chronic abdominal pain, and psychiatric and psychological disorders.
**45 B.
Dr. Getson and Robert Knobler, M.D., Ph.D., a neurologist, were the first two medical expert witnesses called by plaintiff's counsel to testify at trial. Both doctors diagnosed Rodriguez as suffering from CRPS and testified on her behalf as experts in CRPS. Dr. Getson testified first.
1.
During his qualification, Dr. Getson defined CRPS as "an incurable neurologic problem that most often comes following some kind of trauma. It [affects] the nervous system. The primary and hallmark symptom is horrible and unrelenting pain. There are many other symptoms. The exact nature and etiology of this is not clearly known." He explained that when diagnosing CRPS one must "look[ ] and see that there really is no other explanation that better suits that -- the symptom complex, the history and the physical examination, than [CRPS]." The court qualified Dr. Getson as an expert in areas including family medicine and CRPS.
Plaintiff's counsel asked Dr. Getson on direct examination whether he believed plaintiff was "somaticizing" in light of her history of depression. He responded by defining somatization as "the conversion of a psychological issue into a physical problem," and testified that, in his expert opinion, Rodriguez was not somaticizing. He also added that as a general matter he does not believe that "psychiatric or psychological issues have any role in causing CRPS." In his redirect examination of Dr. Getson, plaintiff's counsel specifically asked whether Rodriguez's history of "psychiatric familial issues" could have caused her CRPS. Dr. Getson explained that a treating physician "has to look at the psychiatric history and ask whether or not it has a factor into the diagnosis" of CRPS, and he acknowledged that plaintiff experienced "abuse issues ... as a child." Dr. *120 Getson conceded that those issues would "certainly" have "psychological ramifications," but he ultimately concluded that plaintiff's psychological issues had nothing to do **46 with her CRPS diagnosis and that her psychiatric history would not have "manifest[ed] itself in somatization."
2.
The trial court likewise qualified Dr. Knobler, who teaches a medical school class about the "Borderline between Psychiatry and Neurology," as an expert in neurology and CRPS. Dr. Knobler testified on direct examination by plaintiff's counsel that CRPS is rarely curable and becomes a "chronic, intractable pain disorder." He went on to clarify that, "because there is an underlying basis that is based on the anatomy and function of the nervous system that leads to the development of [CRPS][7] there are many secondary manifestations," including depression, difficulty sleeping, or dysfunction of internal organs. Dr. Knobler explained the reasons for his diagnosis of CRPS, including the reasons for plaintiff's symptoms and the fact that he ruled out other causes that might better explain the symptoms, like plaintiff's automobile accident.
Dr. Knobler also addressed the relationship between plaintiff's past medical history -- including her psychiatric history -- and her diagnosis of CRPS. On redirect examination, plaintiff's counsel asked Dr. Knobler whether he would have expected to observe some physical manifestation of plaintiff's psychiatric history before the Wal-Mart incident, especially because it "goes way back" to her childhood. Dr. Knobler opined that if plaintiff's CRPS were "psychologically caused, it would have manifested itself much earlier" than the June 2010 incident at Wal-Mart. When plaintiff's counsel asked Dr. Knobler about the details of plaintiff's psychological history going back to her childhood, he responded, "It's physical molestation by a parental individual." Never before in pre-trial or trial motions, briefs, or testimony had any party or witness mentioned plaintiff's molestation as a child.
**47 Dr. Knobler also discussed plaintiff's prior medical treatment for chronic abdominal pain and obstetric/gynecological problems. When asked if any of those issues could have caused her CRPS, Dr. Knobler stated that they have "no direct relevance to what transpired with regards to the right upper extremity which is where the problem was." Dr. Knobler also stated that "there was nothing [in previous medical records] relating anything to the right upper extremity until" the Wal-Mart incident.
C.
Next, plaintiff's counsel offered the videotaped de bene esse deposition of Dr. Kahn, plaintiff's treating orthopedic surgeon. While not qualified as an expert in CRPS,[8] Dr. Kahn confirmed during his direct testimony that "the diagnosis of [CRPS] is one of exclusion," meaning that a physician must "go through the exhaustive list of the differential diagnoses" and rule them out when considering CRPS. He explained how plaintiff experienced only temporary pain relief after undergoing both conservative treatment and nerve decompression surgery on her wrist and elbow. During one of plaintiff's office visits, Dr. Kahn observed her exhibiting "overt signs of ... pain out of proportion," which *121 led him to consider CRPS as a possible cause of her pain. As such, he referred plaintiff to Dr. Getson in March of 2012, almost two years after the incident at Wal-Mart.
During cross-examination, counsel for Wal-Mart asked Dr. Kahn whether somatization is "one of the things that has to be excluded" when considering a CRPS diagnosis, and he responded that it was.
D.
Rodriguez testified that her right arm pain never fully resolved, and she ultimately underwent wrist and elbow surgery. The **48 surgical procedures provided temporary relief, but in time, she developed a "burning sensation" and stiffness in her arm. Rodriguez also testified to her limitations because of the pain.
Rodriguez's attorney questioned her about her medical history. She testified on direct examination that her stepfather sexually abused her from age nine to thirteen; she attempted suicide three times before the age of thirteen; she received emergent psychiatric care in January 2010; and she applied for and received Supplemental Security Income (SSI), claiming that she was disabled as a result of her psychiatric condition.
Plaintiff further explained on direct examination that in 2008 she "had multiple surgeries" to treat abdominal pain and obstetric/gynecological issues. She also described a workplace injury to her right shoulder[9] that resulted in an emergency room visit and follow-up care, but she claimed that the right shoulder injury did not restrict her before the Wal-Mart incident. Rodriguez also testified during direct examination to the following accidents: in 2004 she injured her thumb sledding; in 2005 she slipped and fell on ice; and, after the 2010 Wal-Mart incident but before her CRPS diagnosis, she was involved in the automobile accident.
During cross-examination, counsel for Wal-Mart highlighted inconsistencies between Rodriguez's deposition testimony and trial testimony about how the Wal-Mart incident happened. Rodriguez's cross-examination also revealed that she had: stopped attending psychiatric therapy sessions and stopped taking her psychotropic medication when she moved to New Jersey in 2009; visited the emergency room three times for abdominal pain in 2009; experienced a pseudoseizure ending in an emergency room visit in 2009; and sought treatment at the emergency room for severe anxiety and physical symptoms after an argument with her daughter.
**49 II.
We now review the trial record of the testimony of defendant's experts and the trial court's evidentiary rulings related to their testimony.
A.
Dr. Benjamin Mark, a board-certified neurologist and internist who examined Rodriguez in his office about one year before trial, took the stand as Wal-Mart's first medical expert witness. He was asked by defense counsel during qualification whether the field of neurology overlaps with some of the "disciplines of psychiatry and some of the mental working[s] of the brain." Dr. Mark answered, "absolutely because many disorders that involve the brain also affect your mood, behavior, personality. And therefore we do need to *122 cross over and treat patients who have both psychological difficulties with the neurology difficulties." However, Dr. Mark readily acknowledged that he was not a psychiatrist. Without objection from plaintiff's counsel, the court deemed Dr. Mark qualified in the fields of neurology, internal medicine, and electrical studies of the brain.
During his direct examination, Dr. Mark recalled that while he was examining plaintiff in his office, she complained that "anything touching [her] skin throughout the arm" caused her more pain. He explained that when he touched plaintiff's right arm, she "screamed and yelled that it was horrible." Dr. Mark also observed that, "throughout the interview [plaintiff's partner] was constantly rubbing [plaintiff's] right arm, trying to comfort her ... [a]nd she didn't flinch." Dr. Mark referred to plaintiff's symptoms as non-physiologic -- that is, symptoms that "do not follow known neurologic patterns." He opined that he could not find "anything objective aside from [her] subjective complaints of pains," adding that her symptoms "[did] not make clinical sense neurologically."
**50 Even though he previously asked plaintiff's expert, Dr. Getson, if Rodriguez was somaticizing, plaintiff's counsel objected to Dr. Mark's testimony claiming, in part, that Dr. Mark's observations implying that plaintiff magnified her symptoms "invade[d] the province of the jury." The trial court excused the jury and conducted an evidentiary hearing pursuant to N.J.R.E. 104 to determine the admissibility of Dr. Mark's testimony.
1.
During the N.J.R.E. 104 hearing, Dr. Mark defined somatization as "a process where individuals describe experiencing symptoms of various types that are not accompanied by objective findings and interpretations." When asked by the court for the basis of his opinion, Dr. Mark responded that "as a neurologist, I deal with this all the time. Patients are constantly referred to [neurologists] with subjective symptoms that may relate to the neurologic system that nobody else can explain.... So that's not an uncommon presentation." When asked by plaintiff's counsel whether he would diagnose Rodriguez with a somatoform disorder even though he is not a psychiatrist, Dr. Mark responded, "[f]rom a neurology point of view I would," but Dr. Mark noted, "at that point [I would] refer her to a psychiatrist to further investigate."
The trial court allowed Dr. Mark to testify about somatization. The court also allowed Dr. Mark to testify about symptom magnification subject to the judge's limiting instruction.
2.
Upon completion of the N.J.R.E. 104 hearing, defense counsel proceeded with his direct examination of Dr. Mark, who explained to the jury that somatization is a "clinical state where one would present at different times with different complaints." He went on to clarify that, in the absence of a medical cause, "that type of history would then be referred to as a somatoform disorder, somatization." Dr. Mark also testified that any physician, whether a neurologist or psychiatrist, is obligated to explore a patient's **51 subjective complaints "fully and totally" because "one doesn't want to diagnose [somatization] until you've made sure that there is nothing medically going on."
Later, in response to defense counsel's questions, Dr. Mark reviewed plaintiff's history of chronic abdominal pain, and her lower back and right leg pain. He testified that the records he reviewed were prepared *123 "in a context of ongoing psychiatric difficulties," and did not adequately explain her subjective complaints. Dr. Mark stopped short of diagnosing Rodriguez with a somatoform disorder but expressed "concerns" about the validity of the CRPS diagnosis. He opined that plaintiff's "psychological features" were "contributing to her clinical state in a great degree," and, as such, "one has to correct those other factors first before ... talking about CRPS."
When defense counsel inquired of Dr. Mark whether plaintiff could be magnifying her symptoms, the trial court instructed the jury "that ultimately you are the people that judge the credibility of the plaintiff," stating:
[T]he Doctor had within his field of his experience and expertise, utilized what he sees and observes to determine whether the symptoms that are being expressed have some objective basis for them and give an opinion or a basis for them. He can give an opinion with regard [to] that.
But it relates to credibility. And you should understand that ultimately you are the people that judge the credibility of the plaintiff. And so you can take what the Doctor says. But ultimately it's your decision as it relates to credibility of the plaintiff and determine from your determination what to accept and what not to accept.
Dr. Mark explained to the jury that symptom magnification is "a response that seems to be excessive compared to what should be observed in a given situation for most individuals," and with respect to plaintiff, "there [were] some observations that would be compatible with symptom enhancement or magnification."
B.
Next, defense counsel offered the videotaped de bene esse deposition testimony of Dr. M. Eric Gershwin, a board-certified internist and rheumatologist. Unlike Dr. Mark, who conducted a **52 two-hour in-person examination of plaintiff, Dr. Gershwin based his expert report and testimony upon his review of plaintiff's medical records. Prior to playing the videotape, plaintiff's counsel objected to Dr. Gershwin's testimony, arguing that he should not be permitted to give his opinion on somatization and mental or emotional disorders because he is not a psychiatrist or psychologist.[10]
1.
At the N.J.R.E. 104 hearing that followed, Dr. Gershwin testified that somatization and disorders of mental or emotional origin are regularly encountered by doctors who treat chronic pain, and he confirmed that somatization is "part[ ] of [his] everyday practice." He added that he has published articles on other issues in the area of "neuropsychiatry," and authored a peer-reviewed article on the subject of CRPS. The court denied plaintiff's objection, reasoning that, even though Dr. Gershwin "may not be the specialist that ultimately points to [somatization] ... he has experience to be able to recognize it and to identify it and to do something about it."
2.
On direct examination by Wal-Mart's counsel, Dr. Gershwin testified that plaintiff's *124 "diagnosis of CRPS is wrong." After reviewing her medical history, he stated that plaintiff "had enormous medical attention" without any success or prolonged relief. He also noted her "significant psychiatric history" and "long history of chronic pain," and concluded that "[i]t comes back to somatization again, psychological issues." **53 On cross-examination by plaintiff's counsel, Dr. Gershwin claimed that there was "no plausible explanation for [plaintiff's] pain." Dr. Gershwin acknowledged that, in reaching his conclusion, he relied upon his "experience as an internist and as a rheumatologist in seeing patients with somatoform disorders," and not as a psychiatrist.
III.
At the close of the parties' evidence, the court reminded the jury that "one of the most important things that [a juror] need[s] to do is to decide on credibility." He also charged the jurors that only they determine the existence of facts upon which an expert relies and an expert's credibility.
An expert witness may give an opinion on a matter in which the witness has some special knowledge, education, skill, experience or training. An expert witness may be able to assist you in understanding the evidence in the case or in performing your duties as a fact-finder. But I want to emphasize to you that the determination of the facts in this case rest solely with you as jurors.
.... Finally, you're not bound by the testimony of an expert. You may give it whatever weight you deem is appropriate. You may accept or reject all or part of an expert's opinion.
....
It is for you, the jury, to resolve any conflicts in the testimony of the experts using the same guidelines in determining credibility that I mentioned earlier.
The jury unanimously determined that plaintiff failed to prove by a preponderance of the evidence that Wal-Mart was negligent and thus liable for her injuries. As such, the jury did not reach the issue of plaintiff's injuries and left unanswered the damages questions on the jury verdict form. Plaintiff appealed.
In a partially published opinion, the Appellate Division reversed the jury verdict and remanded the case for a new trial. Rodriguez v. Wal-Mart Stores, Inc., 449 N.J. Super. 577, 599, 159 A.3d 914 (App. Div. 2017). The appellate panel held that expert testimony from a doctor, presented as a medical opinion, that "characterizes a plaintiff as a 'malingerer' or a 'symptom magnifier,' or some other negative term impugning the plaintiff's believability" is "categorically disallowed" at a civil jury trial under N.J.R.E. 403.
**54 Id. at 596, 159 A.3d 914 (relying on Nichols v. Am. Nat'l Ins. Co., 154 F.3d 875 (8th Cir. 1998) ). The Appellate Division also found the trial court's limiting instruction insufficient to "ameliorate the undue harm of admitting the expert opinion." Id. at 598, 159 A.3d 914. With respect to Dr. Mark, who is a neurologist rather than a mental-health specialist, the appellate panel determined that he was not qualified to testify about "symptom magnification and related concepts" because he "lacked appropriate qualifications." Id. at 597 n.9, 159 A.3d 914.
In the remaining, unpublished portion of the Appellate Division opinion, the panel concluded that the trial court did not abuse its discretion by admitting evidence of plaintiff's past medical history, including her "accidents and physical and psychological problems" that occurred before the Wal-Mart incident. Citing N.J.R.E. 401, the panel found that "[t]hose background matters were germane to issues of damages, *125 proximate causation, pre-existing injury, and aggravation," and "had a sufficient logical nexus to the medical issues before the jury."
We granted Wal-Mart's petition for certification and thus consider whether the Appellate Division erred when it adopted a bright-line rule categorically disallowing medical experts from using terms like "somatization," "symptom magnification," and "malingering." 230 N.J. 584, 170 A.3d 351 (2017).
We also granted Rodriguez's cross-petition for certification limited "to the trial court's admission of evidence of her prior medical history that was unrelated to [her] claimed injuries." 230 N.J. 565, 170 A.3d 338 (2017).
Additionally, we granted amicus curiae status to the New Jersey Defense Association (NJDA) and the New Jersey Association for Justice (NJAJ).
IV.
A.
Wal-Mart argues that the Appellate Division erred when it adopted a bright-line rule that categorically disallows medical **55 experts from using terms such as "somatization" and "symptom magnification" to describe inconsistencies between the objective medical evidence and plaintiff's subjective complaints or symptoms.[11] It contends that New Jersey courts routinely allow qualified medical experts to use those terms and concepts to explain to juries when a plaintiff's complaints of injury may not be supported by test results, observations, or other objective medical evidence. Wal-Mart maintains that a medical expert testifying in a way that affects a plaintiff's credibility is not unusual and does not unduly influence the jury's evaluation. In its view, such testimony helps the jury in its assessment, and the jury is free to disregard the testimony entirely. Wal-Mart also argues that the exclusion of relevant evidence should be decided on a case-by-case basis pursuant to N.J.R.E. 403 because each plaintiff presents a different comparison between his or her subjective symptoms and the objective medical evidence.
Finally, Wal-Mart claims that since all of plaintiff's medical experts acknowledged through their direct testimony that CRPS is a diagnosis of exclusion, it was reasonable for the trial court to admit plaintiff's past medical history because the risk of undue prejudice does not substantially outweigh its significant probative value.
B.
Rodriguez contends that the terms used by the experts here were actually euphemisms for "faker" and "liar," and resulted in an improper invasion of the jury's most important responsibility -- determining plaintiff's credibility.
**56 In addition, plaintiff argues that the trial court improperly admitted her previous medical history -- including her psychiatric history -- because there was no logical connection between her past medical problems and her CRPS diagnosis. While she does not dispute that CRPS is a diagnosis of exclusion, Rodriguez maintains that her treating physicians were aware of *126 her psychiatric problems and ruled them out prior to reaching their CRPS diagnosis.
C.
The NJDA largely echoes Wal-Mart's arguments. It maintains that the categorical bar adopted by the Appellate Division "improperly restricts the bounds of relevant expert testimony and violates the balancing test inherent in any N.J.R.E. 403 analysis."
Like Wal-Mart, the NJDA also agrees with the Appellate Division's determination that the trial court properly admitted evidence of plaintiff's prior accidents and medical history pursuant to N.J.R.E. 401 because those matters were "germane to issues of damages, proximate causation, pre-existing injury, and aggravation."
D.
The NJAJ mirrors the arguments raised by plaintiff. It maintains that the categorical bar disallowing the use of terms such as "somatization" and "symptom magnification" is necessary to prevent defense experts from impugning the credibility of plaintiffs.
The NJAJ conceded at oral argument that, if introduced by a competent expert qualified to give a psychiatric diagnosis, the term "somatization" or "somatoform disorder" is less likely to implicate the credibility of a plaintiff. It argues, however, that a defendant may not introduce evidence of a plaintiff's prior medical history absent expert testimony demonstrating a logical relationship to the issues.
**57 V.
A.
We begin our discussion by acknowledging the well-established principle that "[e]videntiary decisions are reviewed under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84, 997 A.2d 954 (2010). An abuse of discretion "arises on demonstration of manifest error or injustice," Hisenaj v. Kuehner, 194 N.J. 6, 20, 942 A.2d 769 (2008) (quoting State v. Torres, 183 N.J. 554, 572, 874 A.2d 1084 (2005) ), or when "there has been a clear error of judgment," State v. Brown, 170 N.J. 138, 147, 784 A.2d 1244 (2001) (quoting State v. Marrero, 148 N.J. 469, 484, 691 A.2d 293 (1997) ). This means that a trial court is granted broad discretion to determine both the relevance of the evidence presented and whether its probative value is substantially outweighed by its prejudicial nature. Wymbs v. Township ofWayne, 163 N.J. 523, 537, 750 A.2d 751 (2000) ; see, e.g., State v. Scharf, 225 N.J. 547, 572, 139 A.3d 1154 (2016) (assessing relevance); State v. Nelson, 173 N.J. 417, 470, 803 A.2d 1 (2002) (weighing probative value versus prejudice); State v. Carter, 91 N.J. 86, 106, 449 A.2d 1280 (1982) (same). "Thus, we will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.' " Griffin v. City of East Orange, 225 N.J. 400, 413, 139 A.3d 16 (2016) (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492, 734 A.2d 1147 (1999) ).
B.
The trial court's decision to admit the disputed terms -- "somatization" and "symptom magnification" -- and plaintiff's past medical history depends first upon their "relevancy, 'the hallmark of admissibility of evidence.' " Ibid. (quoting State v. Darby, 174 N.J. 509, 519, 809 A.2d 138 (2002) ). Relevant evidence is "evidence having a tendency in reason to prove or *127 disprove any fact of **58 consequence to the determination of the action." N.J.R.E. 401. "In determining relevance, the trial court should focus on the logical connection between the proffered evidence and a fact in issue ... or the tendency of evidence to establish the proposition that it is offered to prove." Green, 160 N.J. at 492, 734 A.2d 1147 (internal quotations omitted) (citing N.J.R.E. 401, cmt. 1).
Relevant evidence is inadmissible under N.J.R.E. 403"when its probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues in the case." Griffin, 225 N.J. at 421, 139 A.3d 16 (quoting State v. Koskovich, 168 N.J. 448, 486, 776 A.2d 144 (2001) (alteration in original) (internal quotation marks removed) ). However, "[t]he mere fact that 'evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof.' " Rosenblit v. Zimmerman, 166 N.J. 391, 410, 766 A.2d 749 (2001) (quoting State v. West, 29 N.J. 327, 335, 149 A.2d 217 (1959) ).
We have repeatedly observed that determinations of admissibility under N.J.R.E. 401 and 403 are "fact-specific evaluation[s] of the evidence in the setting of the individual case." State v. Cole, 229 N.J. 430, 448-49, 163 A.3d 302 (2017) ; see also State v. Nantambu, 221 N.J. 390, 395, 113 A.3d 1186 (2015) ("[T]he decision whether to admit a recording into evidence is a highly fact-sensitive analysis ...."); State v. Cotto, 182 N.J. 316, 333, 865 A.2d 660 (2005) (stating that ruling on admissibility of evidence of third-party guilt "requires a fact-sensitive inquiry").
In order "to create a record for appellate review of a disputed decision," State v. J.R., 227 N.J. 393, 410, 152 A.3d 180 (2017) (quoting Torres, 183 N.J. at 567, 874 A.2d 1084 ), the decision to exclude relevant evidence as unduly prejudicial is generally made outside the presence of the jury in an N.J.R.E. 104 hearing, ibid.; see, e.g., State v. Wakefield, 190 N.J. 397, 482, 921 A.2d 954 (2007) (noting favorably that Rule 104 hearing was used to redact victim impact statements);
**59 State v. Collier, 316 N.J. Super. 181, 196, 719 A.2d 1276 (App. Div. 1998) (directing that Rule 104 hearing be held on remand for sanitization of evidence).
With respect to expert opinion testimony, such as is at issue here, we have described the balancing test under N.J.R.E. 403 as a "delicate situation that requires the trial court to carefully weigh the testimony and determine whether it may be unduly prejudicial." Torres, 183 N.J. at 580, 874 A.2d 1084. That is so because "the qualification of the [expert] ... may lend credibility to the ... testimony." Ibid."Given an expert witness's singular status in the courtroom, '[t]he uncritical acceptance of expert testimony can becloud the issues.' " J.R., 227 N.J. at 411, 152 A.3d 180 (alteration in original) (quoting State v. R.W., 104 N.J. 14, 30, 514 A.2d 1287 (1986) ). Consequently, we have instructed trial courts "to ensure that the expert does not usurp the jury's function" and "opine on the credibility of witnesses." Ibid.
C.
Before applying the above principles to the questions presented here, we must understand the terms at issue -- "somatization," "symptom magnification," and "malingering."
"Somatization" is defined as "[t]he process by which psychological needs are expressed in physical symptoms; e.g., the expression or conversion into physical symptoms of anxiety, or a wish for material *128 gain associated with a legal action following an injury, or a related psychological need." Stedman's Medical Dictionary 1655 (27th ed. 2000). The Diagnostic and Statistical Manual of Mental Disorders (DSM-5), an authoritative text published by the American Psychiatric Association that classifies mental disorders, includes a category describing "somatic symptom and related disorders." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 309 (5th ed. 2013). All of the disorders included in that category "share a common feature: the prominence of somatic symptoms associated with significant distress and impairment. Individuals with disorders with prominent somatic symptoms are commonly encountered in primary care and **60 other medical settings but are less commonly encountered in psychiatric and other mental health settings." Ibid. (emphasis added).
The term "symptom magnification" is not clinically defined, nor does it appear in the DSM. Here, the term was used only by Dr. Mark, who defined it for the jury as "a response that seems to be excessive compared to what should be observed in a given situation for most individuals." Even though the term is absent from the medical literature, it has been utilized by medical experts testifying in court proceedings to describe an exaggeration of symptoms. See, e.g., Spangler v. Lockheed Martin Energy Sys., 313 F.3d 356, 359-61 (6th Cir. 2002) (concerning employee's appeal of termination of long-term disability benefits under Employee Retirement Income Security Act); Burnside v. Colvin, 197 F.Supp.3d 705, 716 (M.D. Pa. 2015) (reviewing claimant's appeal of denial of Social Security disability insurance benefits).
"Malingering" is defined in the DSM-IV as "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 683 (4th ed. 2000). The DSM-IV alerts health care professionals that "[m]alingering should be strongly suspected if ... the person is referred by an attorney ... for examination" or if there is a "marked discrepancy between the person's claimed stress or disability and the objective findings." Ibid. Although "malingering" was removed from the index in the DSM-5, it remains a diagnostic code, and the criteria for its consideration remain unchanged. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 850 (5th ed. 2013).
With those definitions in mind, we now apply our long-standing evidentiary principles to determine the admissibility of those contested terms. In doing so, we are mindful that this Court disfavors the adoption of per se rules of preclusion when determining **61 the admissibility of evidence because "that practice conflicts with the modern rules of evidence." Wymbs, 163 N.J. at 534, 750 A.2d 751.
1.
Plaintiff's medical experts, Drs. Getson and Knobler, both of whom were qualified as CRPS experts, acknowledged that CRPS requires a treating physician to rule out all other possibilities before reaching that diagnosis. To show that plaintiff's psychological issues played no role in her CRPS diagnosis, plaintiff's counsel asked Dr. Getson, also qualified as an expert in family medicine, whether he believed plaintiff was somaticizing. Although defense counsel used the term "somatization" one time during cross-examination of Dr. Kahn in his pre-trial de bene esse deposition, and one time in his opening statement, *129 this was the first time that any witness utilized the term at trial in any manner. After defining somatization for the jury as "the conversion of a psychological issue into a physical problem," Dr. Getson concluded that plaintiff's psychological issues had nothing to do with her CRPS.
While Dr. Knobler, qualified as an expert in neurology, rejected the idea that plaintiff's psychological history caused her CRPS, plaintiff's orthopedic surgeon, Dr. Kahn, testified on direct examination that he observed Rodriguez exhibit "overt signs of ... pain out of proportion," a concept similar to what Dr. Mark would later refer to as "symptom magnification."
Because there were significant inconsistencies between the objective medical evidence and Rodriguez's subjective complaints of pain, and to counter the testimony of plaintiff's medical experts, Wal-Mart proffered Dr. Mark, a neurologist. Dr. Mark's testimony on "somatization" and "symptom magnification" is relevant because "somatization" was first described in detailed testimony by plaintiff's medical expert and because Dr. Mark's testimony challenged plaintiff's theory of causation in this negligence action. Gaining additional insight from medical experts about whether the incident at Wal-Mart was the event that triggered Rodriguez's **62 CRPS assisted the jury in reaching a conclusion as to a "fact of consequence to the determination of the action." Green, 160 N.J. at 492, 734 A.2d 1147 (quoting N.J.R.E. 401, cmt. 1).
The relevance of Dr. Mark's testimony about plaintiff's "somatization" and "symptom magnification" is underscored by the fact that CRPS is a diagnosis of exclusion that required Rodriguez's physicians to rule out all of her previous mental health issues and accidents as possible factors prior to reaching a CRPS diagnosis. Whether or not her physicians excluded all other possible factors, including psychiatric issues, and properly diagnosed her with CRPS was a significant "fact in issue" in this trial, and Dr. Mark's proffered testimony challenging those conclusions of her physicians was "logically connected" to the question of plaintiff's diagnosis. N.J.R.E. 401, cmt. 1. Accordingly, we determine that Dr. Mark's testimony is relevant pursuant to N.J.R.E. 401.
Having established its relevancy, we now turn to whether Dr. Mark's testimony[12] was subject to exclusion under N.J.R.E. 403. We begin with the term "somatization." At the outset we find that, by itself, the term "somatization" does not suggest to the average juror that plaintiff may have been lying about her injuries. Indeed, the inclusion of "somatization" in the DSM-5 demonstrates that the term refers to a disorder requiring expert medical testimony to "assist the trier of fact to understand the evidence or to determine a fact in issue." J.R., 227 N.J. at 409, 152 A.3d 180 (quoting N.J.R.E. 702).
Our review of the trial record reveals that there was sufficient credible evidence for a jury to conclude that plaintiff's subjective **63 complaints of pain were inconsistent with the objective medical evidence. In light of her previous accidents, her "multiple surgeries" to treat her chronic abdominal pain and obstetric/gynecological *130 issues, her "intractable disabling pains involving her lower back and her right leg," her struggles with depression, and her lengthy psychiatric history, Dr. Mark offered "somatization" as a possible explanation. Importantly, Dr. Mark defined "somatization" as "a process where individuals describe experiencing symptoms of various types that are not accompanied by objective findings and interpretations." He did not use the far more descriptive definition of "somatization" found in Stedman's Medical Dictionary-- "a wish for material gain associated with a legal action following an injury" -- which would have implied that plaintiff was dishonest.
Under these circumstances, we conclude that Dr. Mark's testimony about plaintiff's possible "somatization" was probative, and not so "inherently inflammatory ... as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues in the case." Griffin, 225 N.J. at 421, 139 A.3d 16 (quoting Koskovich, 168 N.J. at 486, 776 A.2d 144 ) (internal quotation marks removed). Thus, the trial court did not abuse its discretion when it admitted Dr. Mark's testimony about "somatization."
2.
Next, applying N.J.R.E. 403, we must determine whether the trial court abused its discretion by permitting Dr. Mark to refer to "symptom magnification." In doing so we first note that on only one occasion did defense counsel or a defense expert mention the term. Specifically, defense counsel asked Dr. Mark whether plaintiff might be magnifying her symptoms. The trial court properly held an N.J.R.E. 104 hearing outside of the presence of the jury after Dr. Mark recalled that during his examination of plaintiff she exhibited hypersensitivity to his touch, a finding similar to Dr. Kahn's observation of plaintiff's "overt signs **64 of ... pain out of proportion." In the end, the trial court admitted Dr. Mark's testimony after instructing the jury that, "ultimately you are the people that judge the credibility of the plaintiff. And so you can take what the Doctor says. But ultimately it's your decision as it relates to credibility of the plaintiff and determine from your determination what to accept and what not to accept." Dr. Mark then responded to counsel's question that "there [were] some observations that would be compatible with symptom enhancement or magnification." We determine that the trial court did not abuse its discretion by admitting this testimony by Dr. Mark.
Unlike "somatization," "symptom magnification" is not defined in the medical literature, and we recognize the term itself may implicate credibility. We are also mindful of the danger that a jury may afford more weight to the testimony of a qualified expert on "symptom magnification" because of "an expert witness's singular status in the courtroom." J.R., 227 N.J. at 411, 152 A.3d 180. However, the concept of "symptom magnification" is likely not "beyond the ken of the average juror," State v. Harvey, 151 N.J. 117, 169, 699 A.2d 596 (1997), because the term itself essentially defines the concept -- it describes a patient's possible exaggeration of her symptoms. Legitimate concern that the term, when used by a medical expert, may implicate credibility does not justify a bright-line rule barring its use by a medical expert. As was done by the trial judge here, courts should conduct a "fact-specific evaluation of the evidence in the setting of the individual case" to determine the admissibility of prejudicial evidence. Cole, 229 N.J. at 448-49, 163 A.3d 302.
Given the inconsistencies between the objective medical evidence and Rodriguez's subjective complaints of pain, Dr. Mark's *131 testimony about his observations of hypersensitivity, and Dr. Kahn's mention of Rodriguez's "overt signs of ... pain out of proportion," we find that any risk of undue prejudice was substantially outweighed by the significant probative value of the expert witness's carefully-phrased opinion about plaintiff's possible **65 "symptom magnification." To the extent that this testimony may have been problematic, we find that the trial court minimized any possible harm by giving an appropriate instruction to the jury before Dr. Mark's testimony, and by its credibility charge to the jury prior to the start of deliberations, Model Jury Charges (Civil), 1.12K, "Credibility" (approved Nov. 1997) ("You will have to decide which witnesses to believe and which witnesses not to believe. Regardless of whether the witness is a lay person or expert, you may believe everything a witness said or only part of it or none of it.").
3.
The final term at issue here is "malingering." The Appellate Division specifically held that Dr. Mark's opinions on plaintiff's symptom magnification were improperly admitted. In doing so, the panel merged its analysis of that term with "malingering ... [and] other equivalent concepts in civil jury cases." Rodriguez, 449 N.J. Super. at 580, 159 A.3d 914. However, none of defendant's medical experts used the term "malingering" during trial; nor did defense counsel. Nevertheless, for completeness, we consider the Appellate Division's categorical prohibition of its use by medical experts in bodily injury claims.
The DSM-IV lists "malingering" as a mental disorder; it remains in the DSM-5 as a diagnostic code. We agree with the panel that the term "malingerer" can "conjure up negative concepts of a person's intentionally wrongful conduct, deceit, greed, evasion of duty, or criminality." Rodriguez, 449 N.J. Super. at 592, 159 A.3d 914. However, we disagree with the panel's determination that the term "symptom magnification" effectively conveys the same notion as malingering, "perhaps with more polite or scientific-sounding phraseology." Ibid. A bright-line rule categorically excluding a term that "might help one side and adversely affect the other" would represent a stark departure from this Court's prior jurisprudence and "would ill-serve the cause of truth **66 and justice." Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 317, 658 A.2d 715 (1995).
Nevertheless, the term "malingering" raises heightened concerns since it may implicate credibility. Therefore, a medical expert's use of the term must be carefully scrutinized, applying an N.J.R.E. 403 balancing test, reviewed on appeal under an abuse of discretion standard. See, e.g., Green, 160 N.J. at 501-02, 734 A.2d 1147 (applying N.J.R.E. 403 balancing in motor vehicle negligence action concluding that trial court abused its discretion by allowing defendant's introduction of plaintiff's racist statements).
D.
Next, we must determine whether the trial court abused its discretion by admitting proof of Rodriguez's past medical history, including her psychiatric history. At the outset of our analysis, we acknowledge that "this Court has long recognized that every defendant, in response to an allegation that his negligence has caused injury, possesses the right of demonstrating by competent evidence that injury could have been caused, wholly or partly, by an earlier accident or by a pre-existing condition." Davidson v. Slater, 189 N.J. 166, 187, 914 A.2d 282 (2007) (internal quotation marks omitted). However, "[a] party seeking to present evidence of a prior injury or condition relating to an *132 issue of medical causation must show that the evidence has some 'logical relationship to the issue in the case.' " Allendorf v. Kaiserman Enters., 266 N.J. Super. 662, 672, 630 A.2d 402 (App. Div. 1993) (quoting Paxton v. Misiuk, 34 N.J. 453, 460, 170 A.2d 16 (1961) ). "The general test of admissibility of such evidence is 'one of possibility rather than probability.' " Id. at 673, 630 A.2d 402 (quoting Paxton, 34 N.J. at 461, 170 A.2d 16 ).
Relying upon N.J.R.E. 401 and 403, plaintiff's counsel filed pre-trial in limine motions seeking to exclude testimony about Rodriguez's prior medical treatment for obstetric/gynecological issues, chronic abdominal pain, and psychiatric disorders. Plaintiff's counsel did not, in his pre-trial in limine motions, specifically mention **67 plaintiff's molestation as a child or her suicide attempts. At argument on the motions in limine, before the parties gave their opening statements, the trial judge denied plaintiff's motions and allowed the testimony. Notwithstanding the limited record before us on this issue, we now apply N.J.R.E. 401 and 403 to determine whether the trial court abused its discretion in admitting plaintiff's medical history.
Rodriguez contends that Wal-Mart's negligence caused an injury to her arm, resulting in CRPS. As explained by both parties' medical experts, CRPS is a diagnosis of exclusion that requires a treating physician to rule out all other potential causes and factors. The issue in the case was, therefore, the accuracy of plaintiff's CRPS diagnosis. In an effort to refute plaintiff's claims, defendant's experts did not offer alternative diagnoses, but pointed to the lack of an objective medical basis for her CRPS by citing plaintiff's history of intractable pain and her psychiatric treatment, which were first introduced by plaintiff's counsel, as possible causes of her complaints. Judges should exercise caution when admitting wholesale sensitive medical information. However, under these circumstances, plaintiff's extensive medical history was "logically related" to the issues of proximate causation, damages, and pre-existing injury. Allendorf, 266 N.J. Super. at 672, 630 A.2d 402.
The trial court described the question of the admissibility of plaintiff's prior medical history as "a disagreement between experts and the basis for their opinions." The judge, favoring inclusion, "allow[ed] the jury to sort through" the disagreements between the experts. We agree with that determination. Preventing Wal-Mart from pointing out plaintiff's past medical treatment and ongoing mental health issues as possible contributing factors to her diagnosis would have been unfairly prejudicial to defendant. Accordingly, we agree with the Appellate Division that, under N.J.R.E. 403, the probative value of plaintiff's past medical history, in light of her claimed injuries and damages, including her **68 psychiatric history, was not substantially outweighed by any risk of undue prejudice.
VI.
Finally, the Appellate Division determined that Dr. Mark lacked appropriate qualifications to render opinions on "somatic disorder" and "malingering ... at a level suitable for admission at a jury trial" because he was not a psychiatrist, psychologist, or other mental-health specialist. Rodriguez, 449 N.J. Super. at 597 n.9, 159 A.3d 914. We first mention that Dr. Mark did not use the term malingering. We also note that "[t]he trial court has discretion in determining the sufficiency of the expert's qualifications 'and [its decision] will be reviewed only for manifest error and injustice.' " Torres, 183 N.J. at 572, 874 A.2d 1084 (alteration in original) (quoting State v. Ravenell, 43 N.J. 171, 182, 203 A.2d 13 (1964) ). Courts take a "generous approach ... when qualifying experts based on training and experience,"
*133 State v. Jenewicz, 193 N.J. 440, 454, 940 A.2d 269 (2008), primarily because the jury is "to determine the credibility, weight and probative value of the expert's testimony." Lanzet v. Greenberg, 126 N.J. 168, 186, 594 A.2d 1309 (1991) (quoting James v. City of East Orange, 246 N.J. Super. 554, 588, 588 A.2d 412 (App. Div. 1991) ); see also City of Long Branch v. Jui Yung Liu, 203 N.J. 464, 491, 4 A.3d 542 (2010) ("It is the unique role of the jury to assess the credibility of the witnesses and the weight to be given to their testimony. Expert testimony is treated no differently ....").
We disagree with the panel's determination that Dr. Mark was not qualified to offer his opinion about plaintiff's possible somatic disorder and symptom magnification because he was not a psychiatrist, psychologist, or other mental-health specialist. Testimony from both parties' medical experts established that there is a significant overlap between the fields of neurology and psychiatry. Indeed, the DSM-5 concludes that somatic disorders "are commonly encountered in primary care and other medical settings but are less commonly encountered in psychiatric and other mental **69 health settings." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 309 (5th ed. 2013). Allowing Dr. Mark -- an accomplished, board-certified neurologist -- to offer somatization and symptom magnification as possible explanations for the inconsistencies between the objective medical evidence and Rodriguez's subjective complaints of pain was not an abuse of discretion. The trial court properly left the ultimate determination as to the "credibility, weight and probative value" of Dr. Mark's testimony to the jury. Lanzet, 126 N.J. at 186, 594 A.2d 1309.
VII.
For the reasons set forth above, we reverse in part and affirm in part the judgment of the Appellate Division. We concur with the Appellate Division that the trial court properly admitted plaintiff's past medical history -- including her psychiatric history -- pursuant to N.J.R.E. 401 and 403. Because we hold that the trial court did not abuse its discretion by allowing defendant's medical experts, including Dr. Mark, to use terms like "symptom magnification" and "somatization," we reverse the judgment of the Appellate Division, in part, and reinstate the jury's verdict of no cause of action.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, and TIMPONE join in JUSTICE SOLOMON'S opinion. JUSTICE PATTERSON did not participate.

Definitions of this term by testifying experts and medical dictionaries are considered later in this opinion. A lay dictionary defines "somatization" as "the production of recurrent and multiple medical symptoms with no discernible organic cause." New Oxford American Dictionary 1615 (2d ed. 2005).

Although not at issue in this appeal, plaintiff offered an expert in the area of both mechanical and safety engineering to establish Wal-Mart's negligence in installing, inspecting, and maintaining the clothing display rack. On cross-examination, plaintiff's engineering expert conceded that Rodriguez "could not have contacted the horizontal bars like she said in her deposition." He also noted that he was "unable to make [the display] go over" when he performed a "bump test" under similar conditions.

The National Institute of Neurological Disorders and Stroke defines CRPS as
a chronic (lasting greater than six months) pain condition that most often affects one limb (arm, leg, hand, or foot) usually after an injury. CRPS is believed to be caused by damage to, or malfunction of, the peripheral and central nervous systems.... CRPS is characterized by prolonged or excessive pain and changes in skin color, temperature, and/or swelling in the affected area.
CRPS is divided into two types: CRPS-I and CRPS-II. Individuals without a confirmed nerve injury are classified as having CRPS-I (previously known as reflex sympathetic dystrophy syndrome ). CRPS-II (previously known as causalgia ) is when there is an associated, confirmed nerve injury....
CRPS symptoms vary in severity and duration, although some cases are mild and eventually go away. In more severe cases, individuals may not recover and may have long-term disability.
[Complex Regional Pain Syndrome Fact Sheet, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Complex-Regional-Pain-Syndrome-Fact-Sheet% 20 (last visited Jan. 30, 2019).]

Approximately four days after filing the complaint against Wal-Mart, Rodriguez filed a complaint seeking damages for her injuries arising from the automobile accident.

In particular, Rodriguez sought to exclude an exchange during defense counsel's videotaped cross-examination of Dr. Kahn as to whether plaintiff's medical records demonstrated a history of somatization. Dr. Kahn declined to conclude that plaintiff's records showed a history of somatization. However, he stated that his review of Rodriguez's records established that she underwent surgical procedures for some ongoing abdominal complaints and that the abdominal complaints "still proceeded as well" -- even after the procedures.

Plaintiff's counsel did not specifically seek to exclude evidence or opinions related to the cause of plaintiff's psychiatric disorders.

The parties' experts at times refer to Reflex Sympathetic Dystrophy (RSD), which is used interchangeably with CRPS.

The parties stipulated to Dr. Kahn's qualifications as an expert in the area of orthopedic surgery.

Dr. Knobler previously stated in his testimony that "there was nothing [in previous medical records] relating anything to the right upper extremity until" the Wal-Mart incident. See supra Section I.B.2.

Dr. Gershwin equated the term "somatization" with the term "psychogenic disorders," which are "disorder[s] in which the principal complaint is pain that is out of proportion to objective findings and that is related to psychological factors." Psychogenic Pain Disorder, Stedman's Medical Dictionary 527 (27th ed. 2000). Dr. Gershwin explained that the terms "overlap," and somatization is "what an internist would use."

During its presentation to this Court, Wal-Mart noted that the term "malingerer" is a not a part of this appeal because it was not used by any of the defense's medical experts during their testimony. The defense conceded that the term "malingerer" carries with it negative connotations that could implicate a plaintiff's credibility. Counsel argued, however, that the Appellate Division erred when it treated the terms "somatization" and "symptom magnification" as the equivalent of "malingering."

Dr. Gershwin's videotaped de bene esse deposition testimony mirrors Dr. Mark's testimony. Since Dr. Gershwin's testimony was played after the trial court ruled that Dr. Mark could testify about somatization, plaintiff's counsel did not object to Dr. Gershwin's use of that contested term, nor did the Appellate Division address his testimony. Accordingly, we do not evaluate Dr. Gershwin's use of the term "somatization" during his testimony.